Boston Safe Deposit and Trust Company & another,
trustees, *vs.* Edward H. Stone, 2nd, & others.

Middlesex.    December 8, 1964. — January 7, 1965.

Present: Wilkins, C.J., Cutter, Kirk, & Reardon, JJ.

*Trust,* Distribution, Trustee's discretion, Counsel fees. *Value. Evidence,*
Relevancy and materiality, Of value.

Provisions of a will, that any distribution of a portion of the principal
of a trust established by the will should be on the basis of the value
of the assets as "reasonably determined" by the trustees and that their
judgment as to the "propriety" of the allotment of assets to the dis-
tributable portion should be "conclusive," did not authorize the trus-
tees to alter the dispositive provisions of the will nor preclude judicial
scrutiny of the trustees' action to ensure an honest, reasonable judgment
arrived at after careful and objective consideration of all relevant fac-
tors, but if such a judgment appeared it was conclusive.    [347–348,
350–352]
An appraisal report obtained by trustees from an experienced firm of
financial consultants as to the value of certain securities was admissible
in a proceeding, not as proof of the value stated in the report, but as
showing information available to the trustees and as relevant on the
issue whether their judgment of the value had been arrived at in a
proper manner.    [352]
In a distribution of a portion of the principal of a testamentary trust
pursuant to provisions of the will showing that the trustees' judgment
of fair value, rather than a value based on book value, should govern in
a necessary valuation of closely held, unlisted corporate stock not hav-
ing any active market and not readily marketable, the judge of the
Probate Court, in passing on accounts of the trustees involving the dis-
tribution, erroneously substituted his own judgment of the value of
such stock at a percentage of book value for an honest, reasonable judg-
ment of the trustees as to its fair value arrived at after careful and
objective consideration of all relevant factors.    [348, 352–353]
In the settlement of an account of testamentary trustees involving a dis-
tribution of a portion of the trust fund to a beneficiary between whom
and an attorney who was one of the trustees there was litigation, an
item for services of separate counsel retained to advise the attorney's
cotrustee respecting important decisions was a proper trust expense to
be charged solely against the beneficiary's distributive share if it ap-
peared that he was the principal cause of incurring the expense, other-
wise against the trust fund as a whole, irrespective of whether the
beneficiary had anything to do with retaining the separate counsel.
[353–354]

Expense of legal services rendered by one of the trustees of a testamentary trust and other counsel in connection with litigation initiated by a beneficiary of the trust should be charged entirely to a distributable share of the beneficiary in the trust fund if it should appear that unnecessary litigation by him was the principal cause of the expense, otherwise against the trust fund as a whole.   [354]

No impropriety on the part of testamentary trustees appeared in their retaining from a distributive share of a beneficiary of the trust a certain amount as a reserve for expenses in view of pending and anticipated litigation between him and the trustees and claims made against his share, and such reserve should be kept by the trustees until all claims by and against him were adjusted.   [354–355]

PETITION for allowance of accounts filed in the Probate Court for the county of Middlesex.

The case was heard by *McMenimen, J.*

*Roger B. Coulter* (*William A. Cotter, Jr.,* with him) for Boston Safe Deposit and Trust Company & another, trustees.

*Paul V. Power* for Mildred Stone & another.

*Robert D. Kilmarx,* guardian ad litem, pro se.

*Lloyd P. Smith* for Edward H. Stone, 2nd.

CUTTER, J.  The trustees filed their first, second, and third and final accounts as trustees under section (4) of the will of Edward H. Stone (the testator).  The testator's grandson, Edward H. Stone, 2nd (Edward), objected to certain items.  The probate judge allowed the first account as filed and the second and third accounts with modifications. The trustees, a guardian ad litem, and the testator's two daughters appealed.  The evidence is reported.  There is a report of material facts.

The testator died in 1940.  By section (4) of his will he left to his son Robert as trustee certain shares of the capital stock of Stone & Forsyth Company (the S. & F. shares).[1]

---

[1] By section (3), as amended by a codicil, Robert individually also was given a legacy of ''such a number of shares . . . that eighty per cent . . . of the aggregate book value thereof, as shown on the books of the corporation at the end of its fiscal year, last preceding the date of my decease, shall be Thirty Thousand Dollars . . . provided, however, that if eighty per cent . . . of the aggregate book value of any number of whole shares shall not be exactly Thirty Thousand Dollars . . . then . . . the largest number of whole shares . . . of which eighty per cent . . . of said aggregate book value shall be less than Thirty Thousand Dollars.''

The testator's widow was to receive the income for her life, and at her death the income was to be paid "in equal shares to . . . [the testator's] children; and if any child . . . be then deceased, said deceased child's share of income shall be paid to his or her heirs."[2]

In 1953, Robert was succeeded as trustee by Boston Safe Deposit and Trust Company (the bank) and Mr. Joseph W. Worthen, as cotrustees. Shortly thereafter, Robert died. His son Edward survived him. When the testator's widow died in 1958, by the terms of the trust Edward became entitled[3] to a one-ninth share of the trust principal (i.e. "such part of the principal . . . as in the opinion of my trustees shall be proportionate to . . . [his share] of current income").

The trustees, in 1958, sought instructions concerning the distribution to Edward. The decree on their petition stated that Edward was "entitled to one-ninth of . . . [the] trust fund" and the trustees were ordered, "in their discretion, [to] pay to . . . Edward . . . his distributive share . . . [subject to certain reserves to meet possible liabilities of Edward] in cash or in kind in accordance with the provisions of . . . [the testator's] will." Doubtless, these instructions were given in the light of section (18) of the testator's will, which reads, "Whenever my . . . trustees shall have occasion to . . . pay over any portion . . . of any estate held in trust under my will, they shall have full power to select and allot . . . for said purpose such portions of the property . . . in their possession . . . *as they may deem to represent fairly in value the portion or por-*

---

[2] Robert individually was also given an option to purchase S. & F. shares from the trust at eighty per cent of book value on conditions which need not be stated in detail. As trustee, he was given (a) power to sell S. & F. shares to employees of the corporation at book value, and (b) power to sell S. & F. shares to any person at any price with the consent of the testator's widow (if then living), of any cotrustee, and of all beneficiaries of full age then currently receiving income.

[3] Edward was to receive his share of the trust fund whenever he should become entitled to receive income of the trust, "if he shall then have reached the age of twenty-five years." He was over that age at his grandmother's death.

*tions so to be . . . paid over;* and the judgment of my . . . trustees . . . as to the propriety of such allotment shall be conclusive on all persons interested in my estate. In making distribution and payments or other divisions of the assets of the . . . trust, the . . . trustees may make . . . payments or divisions without formal appraisal or sale, and *they shall be made upon the basis of the then value of the assets* as nearly as the same can be reasonably determined by my . . . trustees . . ." (emphasis supplied).[4]

The subsequent actions of the trustees are reflected in their three accounts. These facts are stated below in discussing Edward's objections to these accounts.

1. In making the distribution to Edward, the trustees determined the market value of the whole trust fund on October 16, 1959, to be $590,911.93. Edward's one-ninth share was $65,656.88. In their computations, the trustees fixed the value of the trust's 1,782 S. & F. shares at $110 per share. Schedules A–2 and B–1 of the second account show that securities and cash having a market value of $65,656.88 were set aside in a special fund for distribution to Edward. No S. & F. shares were included in this special fund.

Edward objected to the trustees' valuation of the S. & F. shares at $110 per share as of October 16, 1959. The probate judge determined that the S. & F. shares should have been valued at $236 per share, approximately eighty per cent of the then book value of each share. The judge apparently concluded that the testator desired Edward to take "a percentage of the book value of the shares of stock" rather than to receive his share based upon the trustees' "appraisal based upon the market value" of the shares. He ordered the accounts restated to substitute the figure of $236 a share for that of $110 a share.

[4] The decree giving instructions was entered on June 18, 1959. On September 14, 1959, Edward withdrew his appeal from that decree. On that day Edward filed a petition that the trustees be adjudged in contempt for non-compliance with the decree. The petition for instructions had alleged, among other things, (1) that in 1955 Edward had been adjudicated an insane person and committed; (2) that a conservator of his property had been appointed and later discharged; and (3) that he had conducted from 1956 to 1958 an unsuccessful action at law (alleging conspiracy) against his mother, a doctor, and Mr. Worthen. The petition for contempt was dismissed without prejudice on March 1, 1962.

Boston Safe Deposit & Trust Co. *v.* Stone.

The trustees' authority to distribute in cash or in kind (see section [18] of the will) has been established by the decree giving instructions. It does not appear now to be argued that the trustees acted improperly[5] in paying Edward's one-ninth share in cash and property[6] other than S. & F. shares, if they did so on a fair basis.

A trustee in "distributing the trust property in kind . . . must make the division in accordance with the fair market value of the property at the time of distribution." Restatement 2d: Trusts, § 347, comment h. See Scott, Trusts (2d ed.) §§ 347–347.7. See also G. L. c. 203, § 25; *Gleason* v. *Hastings,* 278 Mass. 409, 414–415. Thus, when the trustees decided not to distribute one-ninth of the S. & F. shares in kind to Edward,[7] it became necessary for the trustees (1) to determine the current fair market value of the whole trust fund in dollars, (2) to compute the value of Edward's one-ninth share in dollars, and (3) to distribute to him cash and property having a fair market value at that time equal to the dollar value of that one-ninth share. These computations plainly would not have been difficult if there had been an active market in S. & F. shares so that their fair market value could have been determined on the basis of current sales. Although the record contains only meager findings and evidence concerning the S. & F. shares, it is apparent (1) that the shares were not readily marketable and were subject to a restriction on their transfer, and (2) that the only dealings in the shares were occasional purchases for the corporate treasury at $100 per share and

---

[5] We thus need not consider whether the trustees were justified in distributing no S. & F. shares to Edward by the circumstances alleged in the petition for instructions (fn. 4) or by any other considerations possibly making it desirable to retain the trust's S. & F. shares in one ownership.

[6] This other property appears to consist of securities of well known companies, either listed upon a securities exchange or having some over-the-counter market.

[7] The trustees, of course, could have transferred to Edward one-ninth of the trust's S. & F. shares in kind. See, as to cash adjustments reflecting the fair market value of fractional units, Restatement 2d: Trusts, § 347, comment i.

sales at that price of treasury shares to employees. In the absence of a reasonable volume of open market sales of such stock in a ''close'' corporation, other criteria, in addition to current prices, necessarily must be used in deciding what a ready, willing buyer under no compulsion to buy would pay a ready, willing seller under no compulsion. See, as to other types of property without an active market, *Newton Girl Scout Council, Inc.* v. *Massachusetts Turnpike Authy.* 335 Mass. 189, 195. This type of problem is frequently encountered in appraising closely held securities for inheritance or estate tax purposes. See G. L. (Ter. Ed.) c. 65, § 13; Rabkin & Johnson, Federal Income, Gift, and Estate Taxation, § 52.11, especially subpars. (1), (2), (5), (7), and (10); Federal Estate Tax Regulations (1958), § 20.2031–2; C.C.H. Fed. Estate and Gift Tax Reporter, par. 1202; annotation, 117 A.L.R. 143, 149–162. The valuation problem is in various respects analogous to that in a statutory appraisal of the type considered in *Martignette* v. *Sagamore Mfg. Co.* 340 Mass. 136, 141.

The authority given by section (18) did not confer upon the trustees any discretionary power to vary the trust's dispositive provisions or to benefit in any way one beneficiary at the expense of another. Administrative trust provisions comparable to section (18) are ordinarily designed merely to simplify distribution and to make unnecessary requests for court instructions. Such a provision gives to trustees no discretion to shift beneficial interests in the trust assets such as exists under a fiduciary power to expend principal, upon the standards apparent from the trust instrument, for a life beneficiary (see *Copp* v. *Worcester County Natl. Bank,* 347 Mass. 548). Instead, such a provision, in respect of valuation, merely places upon the trustees the quasi-judicial duty of determining a fact, i.e. the fair market value of particular property at the time of its distribution. In the exercise of such a power, trustees must act with complete objectivity in attempting to distribute the trust assets as directed by the trust instrument.

The language of section (18) shows an intention that the

valuation be made by the trustees and that their honest, reasonable judgment, given after due consideration of all relevant factors, shall be determinative. This does not mean that the power given by provisions of the type found in section (18) is unrestricted or free from judicial scrutiny. Indeed, even with respect to very broad discretionary powers, "a court of equity may control a trustee in the exercise of a fiduciary discretion if it acts beyond the bounds of a reasonable judgment or unreasonably disregards usual fiduciary principles, or the purposes of the trust, or if it fails to observe standards of judgment apparent from the applicable instrument." Such fiduciary powers cannot be used arbitrarily, capriciously, or in bad faith, but must be "exercised after serious and responsible consideration, prudently, and in accordance with fiduciary standards." See *Copp* v. *Worcester County Natl. Bank,* 347 Mass. 548, 551. See also *Price* v. *Price,* 341 Mass. 390, 392–393; Restatement 2d: Trusts, § 187; Scott, Trusts (2d ed.) §§ 187–187.2.[8]

The evidence discloses that the trustees did carefully consider the value of the S. & F. shares. There is no basis in the evidence for finding dishonesty, lack of good faith, arbitrary or capricious action, or a decision beyond the bounds of a reasonable judgment. Mr. Worthen testified (a) that, in view of the litigation brought against him by Edward (fn. 4), he arranged to have the bank, as trustee, advised by wholly independent counsel, and (b) that a well known financial firm, with experience in the valuation of closely held securities, was retained to make a disinterested appraisal of the S. & F. shares. An appraisal report (that

---

[8] As Chief Judge Magruder indicated (at p. 641) in his dissent in *State St. Trust Co.* v. *United States,* 263 F. 2d 635, 640–642 (1st Cir.), a Massachusetts court of equity will "supervise the administration of . . . trusts so as to control any attempt to shift the incidence of their enjoyment." Even broadly expressed administrative and management powers (see p. 642) "are limited by standards which the Massachusetts court of equity could and would apply to supervise effectively . . . [proper trust] administration." We disagree with any suggestion to the contrary (at p. 639) in the majority opinion in that case, which unduly relies upon somewhat general language in *Dumaine* v. *Dumaine,* 301 Mass. 214. A fair reading of the whole of most trust instruments will reveal a "judicially enforceable, external, and ascertainable standard" for the exercise of even broadly expressed fiduciary powers. See *United States* v. *Powell,* 307 F. 2d 821, 826 (10th Cir.).

each S. & F. share at the date of distribution was worth
$110) was submitted by that firm, which acted through the
head of its ''analytical department . . . together with . . .
their man in charge of the analysis of securities in such con-
ditions as these.'' The record contains no evidence offered
in behalf of Edward sufficient to sustain the burden resting
upon him of supporting by proof his contention that the
trustees' decision was not proper.

If for the S. & F. shares there had been a ready market
and if there had been a substantial and constant volume of
sales of these shares, the range of the trustees' permissible,
reasonable judgment as to value would have been narrow.
In respect of share blocks (see annotation, 23 A.L.R. 2d
775) of a size usually traded, trustees, acting within the
''bounds of a reasonable judgment,'' plainly should be
guided in making valuations of readily marketable securi-
ties largely by reported market prices, at least in the ab-
sence of substantial proof that reported prices are for spe-
cial reasons unreliable guides to fair market value. In
valuing closely held, unlisted securities, however, there is
necessarily a wider range of reasonable fiduciary judgment.
Competent experts may differ substantially and honestly as
to such valuations. The evidence shows that these trustees
acted carefully and with competent advice[9] in their effort to
make an honest, fair judgment concerning the money equiv-
alent, that is, the fair market value, of the S. & F. shares.
Under trust provisions like those in section (18), such a
judgment by trustees is to be accepted, where the trustees
have not been shown to have acted dishonestly, arbitrarily,
or without proper investigation, or to have gone beyond
the limits of a reasonable judgment. In the circumstances,

---

[9] The trustees offered in evidence the appraisal report of the independent
firm of consultants, not ''as to the truth of what the appraisal says, but . . .
as evidence of . . . good faith in arriving at this conclusion . . . [and that
Mr. Worthen] didn't act . . . other than . . . reasonably.'' The report, sub-
ject to the trustees' exceptions, was marked only for identification. It was
admissible, even in the absence of direct testimony by the experts who pre-
pared it, for the limited purpose of showing a document to which the trustees
had access and which they had arranged to obtain. See *Runels* v. *Lowell Sun
Co.* 318 Mass. 466, 470–471; *Edelstein* v. *Old Colony Trust Co.* 336 Mass. 659,
664–665.

the probate judge erroneously, and without supporting evidence, substituted his judgment for that of the trustees.

Nothing in the will suggests to us that the testator intended that Edward should take a distributive share determined on any basis other than that he was entitled to receive, as his distributive share, money and property having in the aggregate, at the time of distribution, a fair market value equal to the dollar value of that distributive share. The references to book value of the S. & F. shares in the legacy to the testator's son Robert (fn. 1), in the option given to Robert to purchase S. & F. shares, and in the power to sell shares to corporate employees (fn. 2) do not show any intention that book value should control the distribution. The provisions of sections (14) and (18), which govern the distribution to Edward, contain no references to book value.

The accounts are to be stated on the basis of a value of $110 for each S. & F. share.

2. The probate judge disallowed a charge of $1,322.80 in the second account against Edward's distributive share for services of special counsel for the bank as trustee. In view of Edward's litigation against Mr. Worthen (fn. 4), it was a proper trust expense to provide the bank, as trustee, with separate counsel to help it make impartially important decisions with respect to the distribution of Edward's share. The evidence and certain findings indicate that Edward's actions had necessitated this expenditure.

The probate judge made findings that Edward had nothing to do with retaining the bank's counsel, that $500 had been paid for the independent appraisal of S. & F. shares, and that the charges were reasonable. The judge's findings that Edward had nothing to do with retaining such counsel and that $500 was paid for the appraisal are irrelevant in determining whether the trustees should be allowed the item of $1,322.80 for necessary legal services and whether the item should be charged wholly against Edward's share. Because these findings seem to have been in part the basis of the judge's decision, the decree in this respect must be

reversed. The item is to be allowed, in any event, as a proper trust expense. It is to be charged solely against Edward's share if the probate judge finds that he was the principal cause of incurring the expense. Otherwise, the item is to be charged against the trust fund as a whole.

3. The probate judge modified the third account in respect of two items of $1,828.73 and $1,275,80 for legal services and disbursements, by Mr. Worthen and his counsel, respectively, in connection with Edward's petition for contempt (fn. 4), a separate petition by Edward for declaratory relief concerning the S. & F. shares, and other matters. These fees were allowed by the judge as trust expenses but were ordered charged to the trust fund as a whole. As to this action the trial judge said, "having in mind that the obligation of the fiduciaries is to file accounts . . . a benefit to all concerned, it would be unfair to Edward . . . that he should be charged with any more than his one-ninth share." No evidence justifies the conclusion that these services related to the trust's accounting. Instead, the evidence indicates that they were in connection with proceedings initiated by Edward. If the probate judge determines that unnecessary litigation by Edward was the principal cause of these expenses, they are to be charged wholly to his share. Otherwise, they shall be charged to the trust fund as a whole.

4. The probate judge disallowed a reserve of $5,000, set up in the third account "for expenses to be incurred for services of appraisers and counsel and otherwise in litigation now pending between Edward . . . and the trustees, and in future litigation between them relating to his . . . share . . . and [g]uardian ad [l]item fee." In view of the evidence concerning Edward's conduct and the litigation by and against him, the judge's finding that the reserved amount was "too conjectural" and excessive did not justify interference with this reasonable method of protecting the trustees and the other beneficiaries from future expense unnecessarily caused by Edward, or arising in connection with claims made against his share in the trust

fund. The reserve should be retained until all claims by and against Edward are adjusted. See *Barker* v. *Monks,* 315 Mass. 620, 629–630.

5. The decree is reversed. The case is remanded to the Probate Court for further proceedings consistent with this opinion.

*So ordered.*